All right council we're calling the last case for argument today. We are calling number 19-60273 Ibarra-Aviles v. Garland. All right council for the count. We're on. You ready? Yes your honor. May it please the court. Rebecca Kitson for the petitioner Juan Carlos Ibarra-Aviles. Yes. I would like to reserve five minutes for rebuttal. Okay. Two central issues for the court today is that we have the extensive evidentiary record compels any reasonable adjudicator to find that petitioner has met her burden of a clear probability of harm if she's returned to Mexico where there's no safe place for her to reside and the government is both unwilling and unable to protect her as well as this honorable court retains jurisdiction over the changed circumstances exception to the one-year filing deadline for asylum as a question of law applied to undisputed facts. Therefore it should embrace its sister circuit's holdings that change circumstances include incremental change that increases the likelihood of persecution. This is why this case demands a grant of withholding of removal and a remand to consider the one-year filing deadline exception under the proper legal standard and as Congress intended for it to be applied. Your honors, my client is a transgender woman from Mexico who faces a clear and significant danger of violence and death if she's returned home. Mexico is one of the most dangerous countries in the world for transgender women. She faces risk at all levels of society from the police and the military to every community city and region of that nation. In the record there are over 300 pages of undisputed documentary and expert evidence with extensive and credible testimony by Ms. Barra. No reasonable fact finder could conclude that she can return to Mexico without a clear probability of harm and possibly death. In order to meet this standard, Ms. Barra demonstrated that the Mexican government is unable and unwilling to protect her, that her fear is objectively reasonable under the Mohrabi standards, and that relocation anywhere in Mexico including Mexico City is both unsafe and unreasonable. It's undisputed that she is transgender woman and that she's a member of a In Mexico, transgender women are mutilated, tortured, raped, and killed by the police, military, and across all social strata and geographic areas. Both the immigration judge and the Board of Immigration Appeals erred in not considering or analyzing at all the inability of the Mexican government to protect her from harm. While they may have focused on some very limited legal protections that have passed, neither one of them considered how those legal protections play out on the ground. Furthermore, they encompass legal protections against the overall LGBTI or lesbian, gay, bisexual, transgender, and intersex community and not specifically about transgender women in particular who are at particular risk of harm by all members because of their particular visibility and vulnerability. The Department of State Human Rights Report states that there's persistent threats against all LGBTI people and that there's impunity for human rights abuses throughout the Department of State also warns U.S. citizens that are traveling to Mexico to exercise discretion in identifying themselves as part of the LGBTI community. United States citizens should not identify themselves within the country of Mexico, but somehow the Board of Immigration Appeals. Witness who provided an extensive affidavit, it was not challenged as part of the record, neither the immigration judge nor the Board of Immigration Appeals references or sites Dr. Barnes extensive documentation in the record. She states that transgender individuals in Mexico cannot count on any civil or military official in local, state, or national governments for protection from 541. She also states that hate crimes have tripled in the time period between 2009 and 2014 and that the police themselves are perpetrators of hate crimes 33% of the time. As far as the fear for future persecution, there are two prongs, of course, that establish future fear for either the asylum or withholding standard, both subjective and objective. Here the subjective prong was met. The objective prong should be considered by a reasonable person standard under the matter of Mohrabi. The BIA and the immigration judge did not apply the proper standard of analysis. They did not go through the test, the four-part test as outlined by that case. The immigration judge stated the respondent appears to be female. She does not exude any masculine characteristics that would be readily identifiable in society that she would be targeted for persecution. And that's at page 94 of the record. The BIA additionally errs by accepting this finding and appears to imply that she can hide who she is or that that's appropriate. The Avendano-Hernandez case out of the Ninth Circuit, they considered a transgender woman in the context of protection under the cat. Significant evidence suggests that transgender people are often especially visible and vulnerable to harassment and persecution due to their often public nonconformance with normative gender roles. Again, bringing the court's attention to the four-part test under matter of Mohrabi, the second part of the test is that the persecutor is aware or has a reasonable possibility that they could become aware of the characteristic that they seek to overcome, which clearly is the case because of the visibility and the vulnerability of transgender women in Mexico. Between the years of 2010 and 2012, 126 transgender women were murdered in Mexico. This is despite the estimates that we're only talking about a fraction of the population in Mexico. Most estimates are that transgender individuals encompass less than a fraction of 1% of the overall population. And that as Dr. Barnes, the expert, has established that for every three murders reported, it's estimated that another five go underreported and that one in four hate crimes go unreported as well. Now, the Board of Immigration Appeals and the immigration judge seem to believe that Ms. Ibarra could relocate to the incredibly limited geographic region of Mexico City. But the proper standards for determining reasonableness of internal relocation would say that it's not only that it's safe, but that it's also reasonable as well. Within Mexico City, between the years of 2012 and 2013, there is an agency, a federal agency, that has been established to receive complaints. It's one of the items that the immigration judge in particular focused on. The agency only received during that time one official complaint of a human rights violation of a transgender individual while during that same period of time, there were at least eight violent murders of transgender women in Mexico City. In June of 2012 in Mexico City, the body of a transgender woman was dismembered and her remains were found in various neighborhoods. In that same year, just a couple of months later, a transgender woman was found dead on the street in a suburb of Mexico City. She had been beaten and then decapitated. These are incredibly violent and hateful crimes that are perpetrated, and there's an extensive record of these crimes occurring within Mexico City, where clearly the government is unable to protect transgender women regardless of any surface efforts at providing legal protection. So, counsel, let me just, I mean, you're detailing what I'll concede is substantial evidence, at least on one side of the ledger. There is evidence on the other side of the ledger, it seems, on each of these points. Our standard is very high here. You noted it. The evidence has to compel the opposite conclusion from what the BIA found. Help me with that standard. I mean, it seems to me that, I mean, it sounds almost in some cases like you're making a closing argument. I appreciate that, but the BIA is free to credit some evidence and discredit others or rely more on other evidence. So, how do we get to the point that the evidence compels a conclusion that you advocate versus what the BIA concluded? Well, Your Honor, it is a high standard. However... Is it substantial evidence that the BIA needs to rely on? Is it a scintilla? When do we get compelled by the evidence on the other side? Well, there needs to be... There needs... The Board of Immigration Appeals has, of course, de novo review over the record, and they need to consider the totality of the evidence. So, they do need to consider the entire body of evidence here. The points that both the Board of Immigration Appeals and the immigration judge rely on are literally one line or two lines out of a couple of pages of hundreds and hundreds of documents. So, it's difficult to imagine how any reasonable adjudicator could find that the body of evidence is not overwhelming as far as demonstrating well-founded fear of persecution as well as the unreasonableness of relocation. So, is overwhelming evidence the equivalent of evidence that compels the opposite conclusion? I would say so, Your Honor. I mean, when you look at the overall totality of the evidence here, it would be difficult to imagine how it would be possible to come to the conclusion that it would be possible for my client to return back to Mexico and not suffer a significant chance of harm. What's your best case construing the standard? The best case construing the standard, Your Honor, there's Abdel Messiah out of this court as well that says that it must reflect a meaningful consideration of the relevant substantial evidence supporting the alien's claims. I don't think that we have that here at all. Again, if you review the record, there's very limited support and there's a complete ignorance of very strong and compelling evidence to the contrary. It is one of those rare cases where the evidence compels a contrary finding. And counsel, just while we're all talking about facts versus law, on the asylum application, if the findings that were made by the BIA about the timeliness of the petition, if those are factual in nature, we lack jurisdiction, correct? If they were purely factual, however, if it's a legal question as applied to undisputed facts as the U.S. Supreme Court has just recently explored in the Guerrero-Las Barrelas case, you do have jurisdiction to be able to consider that. In that case, of course, they did consider the section 1252A2D, which is the jurisdiction-granting section of the law that is applicable here. The language of this statute is clear here that change circumstances incorporates the meaning of the word change. Change should include incremental change. And it's also very clear from the congressional record that the intent for this exception was to be broad and to allow for increasing harm. What would be the point of asylum law if somebody wouldn't be allowed to seek protection if it's more dangerous for them now than when they first entered the United States? It doesn't make any sense. And therefore, the definition of change should include incremental change. I think the BIA considered incremental change and simply found that the incremental changes alleged weren't sufficient for change circumstances. How's that not a factual finding over which we have no jurisdiction? Your Honor, in the Board of Immigration Appeals and also with their adoption of the immigration judge's findings, they considered the fact that that Ms. Ibarra, when she entered the United States, that she already knew that she was transgendered. They specifically state that incremental change, the nature of it being incremental change, would preclude the consideration. So from the Board of Immigration Appeals assessment of the case, it does appear that the fact that the change was ongoing or by the Board of Immigration Appeals and it was something that weighed heavily against Ms. Ibarra in this situation. Furthermore, they did not consider at all the change in country conditions, which would be one of the reasons for change circumstances. So they did not consider those at all. It would be the combination of both my client's changes in her personal circumstances as well as the country change circumstances that would converge in order to allow for the change circumstances exception to apply. Can I ask you one question about change circumstances? Is there something in the BIA record or otherwise from the State Department or somebody else about change circumstances? In a lot of these cases, particularly if we're talking about withholding or asylum or whatever, there may be evidence from the State Department about, you know, conditions in the country, et cetera, et cetera. I know this is different because, you know, it's personal, but in general with torture, whatever, whatever, is any of that in the record below from the State Department or some other entity as part of the package? There is evidence of change circumstances, of course, which only applies in the case of asylum. Withholding does not require the change circumstances at all. You can qualify for withholding without change circumstances, but the Department of State does not, the report that's part of the record does not specifically state to changes in circumstances. I misstated it, not so much change circumstances, I meant conditions in the country, perhaps I misstated it. Sometimes there's evidence from the State Department, not a thumb on the scale about the claim, but just when torture or whatever is mentioned, sometimes we're trying to deal with whether civil strife versus, you know, a person caught up in something directed at them. And I was just wondering in the panoply of evidence in the record, whether there's anything from the State Department or some other entity that sort of helps us understand what the but I mean, we'll look at it, but I was just curious. And I'll ask Mr. Meyer to comment on that as well. All right, well, thank you. You've reserved your rebuttal time. All right, Mr. Meyer. Jeffrey Meyer for the respondent. May it please the court. First of all, thank you for allowing me to appear telephonically or by Zoom. I appreciate the consideration. Just some larger points, Your Honor. Yeah, the court certainly lacks jurisdiction over the untimely asylum application determination. While the court may look at constitutional claims and questions of law, the arguments here are centered on factual determinations that are beyond the scope of this court's review. And second, substantial evidence also supports the finding of no past persecution or, and she's not demonstrated a harm that she fears would be perpetuated by the government or individuals that the government is unable or unwilling to control. We've put forth in our brief that substantial evidence shows that the government has proactively implemented measures, enacted laws, and furnished resources to combat discrimination and violence against the transgender community. And finally, the Mexican government has actively endeavored to stamp out discrimination and violence directed at the LGBT community. And although these government efforts have not suppressed all such mistreatment, their interest in ongoing attempts to address these societal ills reflects any claim of government acquiescence. We ask that the petition be denied. I'll just open myself up for questions if the court has some. Counsel, what about counsel opposite's argument that the question about the timeliness of the asylum claim is a mixed question of law? In fact, do we reach it? In my view, it's reviewable to the extent it turns on the interpretation of law, but not resolving any factual disputes. So I don't think the case cited in the 28J really alters the analysis here. I did want to point out one case that was just decided by the board, and I believe it was yesterday. It's a matter of DGC 28INN decision 297 BIA 2021. And the board said that the mere continuation of an activity in the United States that is substantially similar to the activity from which the initial claim of past persecution is alleged that doesn't significantly increase the risk of harm is insufficient to establish changed circumstances as an untimely asylum application exception. And addressing the court's question about is there evidence of a further decline of country conditions in the record? I don't believe so, Your Honor. At least not that I can point to. Okay. All right. Nothing further, Your Honor. Thank you. Okay. All right. Back to you, Ms. Kitson. Thank you, Your Honors. In regards to the board case that Mr. Meyer referenced, that board case specifically had to do with a pre-existing claim in which there was no change, there was no increase in the likelihood of harm and no increase in the likelihood of persecution. So that case is clearly, pardon me, clearly distinguishable from our case at bar because we have both a significant change in Ms. Ibarra's personal circumstances as well as what is established in the record as a strong societal backlash to these minimal legal changes that have occurred within Mexico. Again, when we're talking about legal protections, we're talking about two incredibly limited shifts to criminalize hate crimes and to allow for gender marker to be changed on an identification document just within Mexico City. It's not countrywide. So these are the, quote, legal changes that should be so extraordinary as to provide a safe pathway for Ms. Ibarra to live within a country that's wrought with violence and horrific violence against transgender women across the country, a very large country. And in fact, within the record, it's evidence that the Distrito Federal, which is where Mexico City is located, is the fifth highest place for homicides against transgender women in the entire country. So to your point, as far as what has been the change within Mexico itself, there's ample evidence of a societal backlash to these laws and a continued uptick in violence because of the legal changes. And there is evidence in the Department of State report on the very first within the executive summary, they say that threats continue against LGBTI individuals to include transgender people. So it's very clear that the Department of State report continues to recognize that crime goes unpunished and that transgender people are at risk within Mexico. So our own Department of State states that. And there's no exception within the report for Mexico City. While they recognize those limited legal protections, they also state that there's ongoing reports that they're not being followed and that transgender women are still subjected to violence, which would be why the Department of State continues to tell United States citizens to not present themselves as transgender when they're traveling in Mexico. Likewise, they don't have an exception for Mexico City either. There's no discussion, no conversation about this societal backlash within the Board of Immigration Appeals or the immigration judges report. So again, if the government, it's not only that the government is unwilling, which I would say it is unwilling overall, because we're only talking about incredibly narrow reforms, but they're not only unwilling, but they're unable. Again, there's no discussion at all about what the actual impact of these supposed legal protections are. The result is there's more death, there's more harm, and there's more risk. And it has significantly increased. This is something that is recognized and detailed with the contemporaneous case of Avendano Hernandez out of the Ninth Circuit that has the same expert that we had in this case that was ignored. So that the Ninth Circuit in allowing for cat relief for a transgender woman from Mexico from 2015, which is the same time frame as my client, noted the societal backlash, noted the fact that these legal protections have conversely resulted in a more dangerous environment for transgender women. Even the immigration judge and the Board of Immigration Appeals recognize that there is great violence against transgender individuals, but it's written off as generalized violence. It's not generalized violence if it's directed against a protected social group. That's persecution. And so if you're recognizing the violence, you can't then turn around and conversely say that it doesn't exist. In this case, Miss Ibarra, if she's returned to Mexico, faces a very significant risk of significant harm and persecution by actors, both private and state, across the entire nation. Let me ask you, we've been on the bench this morning since 9. I note that at 9.16, the clerk sent us 28 J's of ample, one's 38 pages and the other is 18 pages. So we've been on the bench, so we quite clearly have not read them. So are those your filings? And if so, what are they? I mean, I haven't opened them. I just see them. What are their cases? They're brand new cases or what? They are. They're relatively new cases, Your Honor. And one is the U.S. Supreme Court case, Guerrero-Las Villas case, which was just passed at the very end of last year, that outlines the fact that questions of law as they're applied to undisputed facts or mixed questions of law and fact, specifically as they apply to Section 1252. All right, let me stop you there. So the first one is the SCOTUS case from the end of 2020? Right. Go back and read 28 J. Anything that was decided in 2020 should not be in a 28 J. 28 J is designed to bring to the court the attention of a recently decided case, something that could not have been in your brief. So if this was a case that was decided, then it should have been in your brief and not in a 28 J. So just saying, I'm not saying we're not going to read it, that's not what 28 J is designed for. If it was on the books in 2020, it should be in the brief. So what's the second one of 18 pages? Is that another case? It is, Your Honor. And without the respect, we completed briefing of this case in November of 2019. So these cases did actually occur in the interim period between... I mean, I'm not lecturing you, but there is such a thing as filing a supplemental brief. You just ask the clerk to file a supplemental brief so you can argue about it because 28 J is not designed for argument. It's just to present a case. So if you present the case, all it is is here it is. But if you wanted to argue to import up the case, you just simply ask for supplemental briefing. We would have allowed it. And then the other side has a chance to respond and all that. I'm just pointing it out because when I saw 31 pages here, it just didn't sound like to me it was something decided by the Supreme Court yesterday. But in the future, you know, ask for supplemental brief. It's rare that we would deny that. I mean, we're going to take a look at it, and I don't know if it's argument, and it will give the other side a chance to respond. But we'll look at it. But like I said, we've been on the bench, so we couldn't see it this morning. So at best, if you were filing, you should have filed it yesterday or something. But anyway, that's just a learning point going forward. It's not penalizing you in this proceeding. Although there are some members of this court that was stricken this 28 J because it's not within the rules. You happen to have one of those. Well, probably a more forgiving panel, I'll just put it like that, with respect to what you file. But just know that they are some that strictly construe the law. And this would be out. That's all I'm saying. Okay. Something wrong. But I'm just saying, we've got some other cases where briefing was completed in 2019. Just file a supplemental brief. Matter of fact, I read the supplemental brief and not the old brief. All right, that's fine. Any other questions from the panel to Miss Kitson on rebuttal? All right, well, that concludes the argument. Thank you. We've been doing Zoom since April of 2020. So, you know, it's in the toolbox now. So we do it when we have to. But, you know, we like to have a little argument to help us with these tough cases. So that concludes the argument in this case. It'll be submitted. We'll try to unravel it as best we can. Okay. Thank you. All right. The panel stands in recess.